WILLIAM S. HART, Appellee, v. FARMERS MUTUAL FIRE & LIGHTNING INSURANCE ASSOCIATION OF WINNESHIEK COUNTY, Appellant.

No. 39110.

SEPTEMBER 24, 1929.

*Mears, Lovejoy, Jensen & Gwynne* and *H. Haehlen,* for appellant.

*William S. Hart* and *A. E. Sheridan,* for appellee.

MORLING, J.—On August 22, 1917, defendant issued to plaintiff the certificate of insurance sued upon, by which defendant was insured against loss by fire on a barn for $3,000. The barn was totally destroyed by fire March 6, 1925. Defendant, among other defenses, set up nonpayment of two assessments for the years 1924 and 1925, notices of which were dated February 1, 1924, and February 2, 1925. After defendant had so answered, in the suit on the certificate, plaintiff commenced the suit for accounting. Plaintiff's principal contention is that defendant was owing him large sums for legal services; that the amounts owed by him for assessments should be credited upon the amount owed to him; and also that, by arrangement between plaintiff and defendant's secretary, the assessments were not required to be paid, but were to be credited; that, by reason of these matters, he was not in default for nonpayment of assessments. Defendant denies plaintiff's claim for legal services and the alleged agreement, and alleges payment for all services rendered.

By the contract, "any member failing to pay his or her assessment within thirty days after notice thereof by the secretary his or her policy shall stand suspended until all dues to the association are paid."

The levying and notices of the assessments and (unless defendant is indebted to plaintiff as he claims) their nonpayment, are not disputed.

Plaintiff's own uncertainty as to the services performed is demonstrated by his petition in the accounting suit, in which he alleges that he "has no detailed or itemized account of the liabilities of defendant to him, and same are unliquidated, unadjudicated, and unsettled between the parties; and defendant has a complete, itemized record of all insurance contracts * * * and of all premiums assessed thereon * * * and also a complete itemized record of all payments actually made by defendant to plaintiff in payment of losses * * * and for legal services or other services rendered and expenses incurred by plaintiff for and on account of defendant, and a complete showing and exposition as to said insurance contracts and assessments and premiums thereon and payments by defendant to plaintiff either for insurance losses sustained or services rendered and expenses incurred * * * and consents that, upon an itemized showing as to such premiums and assessments, that same may be credited at proper time and in proper manner upon the indebtedness of defendant to him. * * * Plaintiff is entitled to recover from defendant the balance due him from defendant, but is unable to determine same, in the absence of a full, complete, and final accounting between the parties; and defendant refuses to enter into such an accounting, and refuses to furnish the data and information necessary to plaintiff for him to determine the exact amount due him and submit specific demand therefor to defendant. * * * Plaintiff is, at this time, preliminarily and interlocutorily to final trial and submission herein and final accounting between the parties hereto, entitled to a statement of the liabilities and credits of both parties, the record and knowledge of which is in hands of defendant, and without which plaintiff is unable to set out, prove, or establish the liability of defendant to him, or the credit which defendant is entitled to thereon." Plaintiff attaches interrogatories requiring defendant to "give in chronological sequence a list of all insurance policies at any time issued by defendant to plaintiff, * * * giving in each instance date of policy, name of insured, amount of policy, location of property, and a general designation, * * * and state what premiums have been paid in cash upon such policy, and what assessments, designated

by percentage or otherwise, have been levied by defendant;" to state what levies have been made; to give in detail each payment for loss sustained; and to "state fully and in detail all payments at any time made by defendant to plaintiff for legal services or services of like nature or expenses connected therewith or incident thereto. Set out each payment separately, giving date and amount thereof, and state for what such payment was made, as disclosed by record and account books of defendant." These interrogatories were answered by setting out a list of some seventeen policies and the levies against them, and stating that the assessments from 1913 to 1923 appear to have been paid, but that defendant is unable to state the details thereof, "further than said records show the acceptance of a note by defendant from plaintiff in the year 1921 in the sum of $33.90, and on October 10, 1920, $33.90, and that said notes were paid by deducting said amount from payments made by defendant to plaintiff on or about the 15th day of October, A. D. 1923, at which time full settlement was had between plaintiff and defendant, and at which time defendant paid plaintiff for certain legal services * * * in the sum of $1,000."

Plaintiff kept no account or memorandum of his alleged services. He says his consultations were entirely with the secretary, and a few times with the president; that he was paid up to 1913; that he received nothing on his services between 1913 and 1919 except $35.00, and "submitted no formal statement."

"I do not think I got any pay from 1919 until I got the $1,000 in the Regan case, and rendered them no statement during that time. I talked about it with Goodykoontz [defendant's secretary]. We never mentioned any amounts. I never submitted any bill or statement for any specific amount."

In testimony, he claims for several different classes of services, and for some individual cases. His testimony consists almost altogether of generalities. No useful purpose would be accomplished by extensive references to it. We are of the opinion that the evidence shows payment to October 15, 1923, for all services to that date, and fails to show any indebtedness incurred thereafter.

Plaintiff testifies:

"Commencing in 1922 or 1923, continuing to 1925, there was a fire epidemic. * * * of suspicious origin. A great deal of time was taken up with defendant secretary and investigators of state fire marshal's office, and with parties who suffered fires, and other parties. I think there were seven or eight such fires. Spent many different days in consultation with secretary, several days and nights with fire marshal from state marshal's office and owners of property. One day, Goodykoontz came to my place on Sunday, and we spent entire day at my office, with Mr. Devitt. * * * Suspicion was directed largely toward one party that had had litigation with insurance company. I viewed premises after fire, interviewed people who were first at fire. I cannot fix times exactly. Toney had two fires. Think I put in more time on Devitt fire than any other. I was consulted with reference to Ford fire and Heddington fire. Work in connection with barn fires was almost continuous for about three years. Goodykoontz was in my office practically every day, for two or three weeks at a time. * * * Value of services in connection with barn fires was worth more than $700."

On cross-examination, he says:

"I couldn't tell how many times he was here. I can't remember the instances, only the Regan controversy and the Devitt loss. There was another loss in the eastern part of the county. I forgot what one it is. * * * There was no controversy between Devitt and the insurance company about his loss."

The secretary testifies:

"I had no conversation whatever with Mr. Hart concerning the fire epidemic of barn burnings, that I know of. I wrote to the fire marshal's department, and he or some deputy came here. I do not recall any consultation between Hart, the insurance marshal, and myself. The marshal usually came to my office. I have gone with him to Hart's office while he was here. He and Hart are good friends. It is possible that I had a conversation with Mr. Hart with reference to the Regan house burning, prior to the time Regan was prosecuted for arson. We tried to get Hart to prosecute Regan, but he said he couldn't take it at that time. Mr. Hart represented us in the suit that Regan brought against us for the loss of his barn."

On the question of payment, the secretary says that, after the Regan "case was over, Hart rendered a bill, and it was paid for. At that time, no mention was made by plaintiff for any other claim of services than the Regan case. * * * Asked Hart for his bill, and he rendered it. I wrote out the check for $1,000, and requested that it come back to me, which it did. We held notes against Hart for his premiums on assessments. This was taken out of the $1,000 check. He indorsed check to me, and I gave back my personal check for difference. * * * The difference, of $200, went to pay the note or notes held by defendant from Hart for assessments, with interest thereon for two years or more, and a balance. * * * The amounts paid defendant company on notes was $84.90 and $23.25. That was for assessments on his policies. No further assessments were paid to either myself, defendant, or any officer of defendant, to my knowledge, on plaintiff's policies with defendant after this time, which was about October 23, 1923."

Plaintiff testifies:

"In 1919, I did some work in the Lindorff case. Goodykoontz said he would pay me for that case the same as in the Regan case. I got a check for $35 for it. * * * After the Regan case, Goodykoontz asked me how much they owed me. I said $1,000, and he said that was reasonable. Except for those two cases, I have not been paid for my services, except credit on some of my assessments, since June, 1913. I am not claiming anything back of the $50 check in 1913."

It will be noticed that plaintiff says:

"After the Regan case, Goodykoontz asked me how much they owed me. I told him $1,000."

As we understand the testimony, particularly that of the secretary, the services in the Regan case were a part of those involved in the "fire epidemic" cases. Plaintiff values these  services at $700. We do not find that he (aside from his statement of charge) places a valuation separately on the Regan case, or values any set of services at $1,000. Goodykoontz says:

"I supposed we had a full and complete settlement with

plaintiff in October, 1923, at the time of payment of $1,000. That is what I meant when I signed Exhibit 1. He never claimed anything until he started action.''

(Exhibit 1 contains the answers to interrogatories.) No exceptions were taken to the answers. Plaintiff offered them in evidence ostensibly ''for the purpose of impeaching the witness Goodykoontz.'' The answers were, nevertheless, thereby offered, and are evidence. Code of 1927, Section 11185; *Sears v. Starbird*, 78 Cal. 225 (20 Pac. 547). The answers state that, about October 15, 1923, full settlement was had. They further state that ''some of the assessments * * * were, in all probability, made by deducting same from the amount of plaintiff's recovery on certain losses under insurance policies, * * * but that the exact character of the payment is at this time unknown to this affiant;'' that there have been no payments of assessments since 1923, except $47.20 in 1926; ''and that defendant's records fail to show any services rendered by plaintiff for defendant since sometime prior to October 15, 1923, at which time full settlement was had between parties to this action.''

Plaintiff in his petition, as has been shown, says that he has no detailed or itemized account; that defendant has a record of all payments; and that plaintiff is entitled to a statement of the liabilities and credits of both parties, the record and knowledge of which is in hands of defendant. It is hardly credible that if, on the two occasions on which payments were made by the defendant to plaintiff for services, plaintiff understood that he had the other claims and charges against defendant for which he is now seeking to recover, he would have said nothing about them when defendant was asking for its bill. Defendant had in 1919 paid plaintiff for services. Before the ''fire epidemic'' cases, plaintiff had given to defendant notes for assessments and for small amounts. The secretary says that the assessments for 1921, 1922, and 1923 were taken out of the $1,000 payment, as well as plaintiff's notes, which were for other years. It is a reasonable inference that plaintiff would not have given these notes if the defendant was indebted to him as he now claims, and that he would not have permitted the notes to be taken out of the $1,000 without putting in his bill for the other services. While the order for the $1,000 states it to be ''on account of fees in the

Regan case," and that of October 8, 1919, for $35, to be "on account of legal services on the W. J. Lindorff matter, and also opinion by order of board of directors," we are of the opinion that the parties understood, at their respective dates, that plaintiff had no other charges against defendant for services, and that the orders were in full payment.

At the time the $1,000 was paid, an action brought by J. F. Clark against defendant was pending. That action was docketed December 23, 1921, and settled September 12, 1924. Plaintiff says that he does not think he filed any pleadings; that there was a question of amount of grain actually destroyed, and also some that was damaged, which led to a large amount of negotiation between the company and Clark; "that the reasonable value of his services, taking into consideration amount in controversy, was $100;" and that the question was the value of the property destroyed, and as to whether the policy covered threshed straw. The secretary testifies that they agreed to leave the matter to the thresher, who said that about 200 bushels of oats were burned up entirely, and about 300 damaged, and they figured the amount of damage to be about $82; that the only controversy was the difference in the price of the oats per bushel; that plaintiff said that Clark was a relative of his, and he could not handle the case. The settlement was for $100. It does not appear that any services were rendered after October, 1923. It is the opinion of the court that the $1,000 payment made October 15, 1923, was made by defendant and received by plaintiff on the understanding that it was in full for all services to that date.

Plaintiff testifies to having sustained losses on other policies, on two of which he received checks. The evidence is wholly insufficient to show any unpaid liabilities of defendant to plaintiff for losses sustained.

It follows that plaintiff is not entitled to recover in his accounting suit, and that the policy sued on was, at the time of the loss, in suspense for nonpayment of the assessments of 1924 and  1925. In saying this, we are not to be understood as intimating that the existence of an unliquidated disputed right of set-off may be made use of by insured to obviate suspension due to nonpayment of premiums or assessments. See *Stutzman v. Cicero Mut. Fire Ins. Co.*, 150 Wis. 254 (136 N. W.

604) ; *In re Receivership of Schanke & Co.,* 201 Iowa 678; *Fremont County v. Fremont County Bank,* 145 Iowa 8, 13; 6 Words & Phrases 5253; 34 Cyc. 637; 1 Pomeroy's Equity Jurisprudence (4th Ed.), Sections 113, 175. We find no evidence of any agreement by defendant to credit assessments on account, or to waive the postponement of payment of them.

Plaintiff contends that the notices of assessment do not conform to the requirements of Section 8959, Code of 1924 (Section 1727, Code of 1897). That section declares that no policy "provided for in this chapter" shall be forfeited or  suspended for nonpayment of premium or assessment unless, within 30 days prior to maturity thereof, the company shall serve notice that it is due or to become due, stating the amount and the amount of customary short rates. That chapter is Chapter 4 of Title IX, Code of 1897. Defendant is organized and does business under Chapter 5, Title IX, Code of 1897, which was repealed, and for it a new chapter of the same number substituted in the Code Supplement of 1913. See Chapters 404, 406, Code of 1927. Section 8959, Code of 1924 (1727, Code of 1897) has no application. *Early v. Bremer County F. M.. F. Ins. Assn.,* 201 Iowa 263; *Beeman v. Farmers Pioneer Mut. Ins. Assn.,* 104 Iowa 83.

The case presented is not one of forfeiture or cancellation, but of suspension for nonpayment of assessments. The contract is: "Any member failing to pay" his assessment shall stand suspended. After the expiration of the 30 days without payment, the certificate is *ipso facto* suspended. *Early v. Bremer County F. M. F. Ins. Assn.,* 201 Iowa 263.

Plaintiff testifies that, on the morning of the fire, he told Goodykoontz about it, and Goodykoontz asked, "Isn't there some assessment slips up there in the office?" He further testifies that Goodykoontz said, "That can be taken  out when we have a settlement;" and further said that plaintiff need do nothing about the fire, that Goodykoontz and the adjuster would go down and adjust the loss, that they had no money to pay, and did not know whether they could borrow; that, sometime later, Goodykoontz said that they had been down, and the barn was gone, that they did not know what they were going to do about the loss,—had no money; that plaintiff said it would be

all right to have the money when he rebuilt in the fall. Goody-koontz said that would be fine; that they could just as soon pay him interest as anybody else; that, in the fall, Goodykoòntz said they were just as hard up as ever,—couldn't raise money. "I think he told me the assessment would come in February some-time. I said, 'I can't wait that long.' "

Goodykoontz denied these conversations, and he and his wife testified that, at the time of the fire, they were in California. Re-gardless of the sufficiency of plaintiff's testimony, if true, to show waiver, he has failed to sustain the burden of proof here resting upon him.

Plaintiff urges that defendant levied another assessment in 1925, and thereby recognized the validity of the policy, and con-tinued to so recognize it until the fall of 1925. Nothing as a waiver is claimed because of the counterclaim to recover assessments. The counterclaim seeks to recover the assessment for 1924, and not for later assessments. Failure to pay assessment is not claimed as, and did not have the effect of, forfeiting the policy. Plaintiff by delinquency was "suspended until all dues to the association are paid." This provision recognizes the right of the plaintiff to pay his dues after suspension, and thereby re-store the policy; but plaintiff has not paid his assessments for 1924 and 1925. Even if the levy for 1925 operated as a waiver of suspension for delinquency in making payment of the 1924 assessment,—a point which we do not decide (see *Beeman v. Farmers Pioneer Mut. Ins. Assn.*, 104 Iowa 83; *McGowan v. Northwestern Legion of Honor*, 98 Iowa 118; *Neiman v. City of New York Ins. Co.*, 202 Iowa 1172, 1177),—still the 1925 assess-ment was in default at the time of the loss, and had been for more than 30 days after notice. The evidence (answers to interroga-tories) is that the assessments were "levied against the policies held by the company and in force" for the years stated. The certificate at the time of the loss was in suspension, at least for nonpayment of the 1925 assessment. As has been said, the ques-tion here is one of suspension, not of forfeiture. *Early v. Bremer County F. M. F. Ins. Assn.*, 201 Iowa 263; *Hiatt v. Union Mut. Cas. Co.*, 208 Iowa 974. See 32 Corpus Juris 1349. The assess-ment for 1924 was apparently earned. *Mandego v. Centennial Mut. Life Assn.*, 64 Iowa 134.

Other defenses to the suit on the insurance certificate are set up, but because of that which has been considered, require no discussion.

Before answer, defendant moved to transfer the accounting case to the law side of the docket. The motion was overruled. If erroneous, the ruling, as a result of our views on the questions discussed, was without prejudice.

Plaintiff's indebtedness to defendant for $133, as found and allowed by the court in the accounting suit, is not questioned, and defendant is entitled to judgment therefor. The judgment in favor of plaintiff in the accounting suit for $817 and the judgment in favor of plaintiff in the suit on the insurance certificate are—*Reversed*.

EVANS, DE GRAFF, KINDIG, WAGNER, and GRIMM, JJ., concur.